**Dawn M. MALONE, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. CV 498–082.**

United States District Court,
S.D. Georgia,
Savannah Division.

Aug. 27, 1999.

R. Daniel Price, Rincon, GA, for plaintiff.

Kenneth D. Crowder, Augusta, GA, for defendant.

### ORDER

NANGLE, District Judge.

Before the Court is defendant's motion to dismiss or alternatively to grant summary judgment. For the reasons that follow, defendant's motions are granted.

### Background

Plaintiff, a civilian, asserts a claim in negligence under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq. On August 20, 1995, plaintiff was raped, sodomized and beaten by Private E–2 Roderick R. Woods while Woods was supposed to be on restricted status. Def.'s Mem.Supp.Mot. Dismissal/Summ.J., App. J, "Stip. of Fact, *United States v. Woods* " at 6–10 (Doc. 19). Six weeks prior to this rape, Private Woods had raped and sodomized another soldier at Hunter Army Airfield. Woods' commanders had placed Woods on restriction pending court martial as a result of the first rape. Def.'s Mem.Supp.Mot. Dismissal/Summ.J., App. J, "Stip. of Fact, *United States v. Woods* " at 5. Plaintiff contends that her attack was the direct and proximate result of the negligence of the United States of America through the United States Department of the Army and its agents for failing to properly confine Private E–2 Roderick R. Woods after charging him with the first rape. Plaintiff states that she was injured and has suffered permanent mental distress and psychological damage as a result of being raped and sodomized by Woods. Pl.'s Compl. at 6 (Doc. 1).

### The First Rape

At the time of the first rape, Woods was assigned to the 24th Ordinance Company, 260th Quartermaster Battalion, located at Hunter Army Airfield in Savannah, Georgia. Private X[1] served in this same company and was quartered in the same barracks as Woods. In the early morning of July 2, 1995, Private X went to the first floor of the barracks to visit a friend, but found that her friend was not in his room. While in the hallway, Woods spoke with Private X and invited her to come into his room to watch television. Private X agreed to come in for a few minutes. Inside his room, Woods exposed himself to Private X and locked the door. In an ensuing struggle over the doorknob,

---

**1.** The victim's real name is withheld to protect her privacy.

Woods grabbed Private X and began to unclothe her. She screamed for help, but no one responded, presumably because many in the unit were away for the Fourth of July weekend. Def.'s Mem.Supp.Mot. Dismissal/Summ.J., App. J, "Stip. of Fact, *United States v. Woods* " at 2–3.

Because her screams and struggles were making Woods more violent, Private X quit screaming, fearing that Woods would hurt her further. Despite Private X's continued pleas, Woods repeatedly raped her and alternately anally and orally sodomized her. During the attack, Private X continued to struggle with Woods, hitting and scratching him. Private X was finally able to convince her attacker to allow her to leave the room. She immediately ran for help and notified the military police. Woods was subsequently charged with rape, forcible sodomy, assault consummated by a battery, and housebreaking. Def.'s Mem.Supp.Mot. Dismissal/Summ.J., App. J, "Stip. of Fact, *United States v. Woods* " at 3–5.

### The Order for Restricted Status

After his arrest, Woods' commanding officers, Captain Scott Bodine (Woods' Company Commander), Lt. Colonel Stephen Passero (Woods' Battalion Commander), and Colonel Joel McGrady (Woods' Brigade Commander) conferred to determine the course of action to follow with Woods pending trial. The above commanders consulted with Captain Joseph Pixley, the trial counsel at Hunter and with Colonel Waldo Brooks, the Staff Judge Advocate. Def.'s Mem.Supp.Mot. Dismissal/Summ.J. at 2–3. The group decided against confining Woods pending trial and ordered Woods to be transferred to the Headquarters & Headquarters Company, 24th Corps Support Group ("HHC"), at Fort Stewart, Georgia, located forty miles away. Woods was ordered to be on restricted status, and Captain Wilson, Woods' new company commander, was given the responsibility to determine the nature of the restrictions to be imposed. Def.'s Mem.Supp.Mot. Dismissal/Summ.J. at 3–4.

Numerous factors were considered in making the decision to transfer Woods and to not imprison him before trial. An attempt was made to balance Woods' individual liberty interests with the interest of protecting the general public. Def.'s Mem.Supp.Mot. Dismissal/Summ.J. at 4. The commanders considered the circumstances of the rape, that Private X was an acquaintance and that the rape occurred in Woods' barracks room over a holiday weekend in close proximity to other soldiers. They also considered Woods' background, including any prior "AWOLs (Absent Without Leave), any flight attempts in this incident, and any known threats." Def.'s Mem.Supp.Mot. Dismissal/Summ.J., App. B, Decl. Joel L. McGrady at 2. The commanders determined that the circumstances did not support a belief that Woods constituted a danger to the community at large or that Woods was a flight risk.

The transfer was designed to protect Private X and three other witnesses who were involved in incidents of peeping to which Woods had confessed to criminal investigators, not because of a belief that Woods was a danger to the general population at Hunter.[2] Also, the relocation was designed to have a "sobering" effect on Woods' future behavior. Defendant also explains that the confinement facility used by Ft. Stewart is the Naval Brig in Charleston, South Carolina, well over a two-hour drive from Ft. Stewart. Because Woods' defense counsel was at Hunter, confinement would have necessarily in-

---

**2.** The Court finds it disheartening that the military commanders did not give greater weight to these peeping incidents when determining whether Woods posed an ongoing danger to women (of course, this is more clear in hindsight). *See* Def.'s Mem.Supp. Mot. Dismissal/Summ.J., App. A, Decl. Stephen P. Passero; App. B, Decl. Joel L. McGrady; App. C, Decl. Waldo W. Brooks; App. E, Decl. Scott Wilson; *see also* Def.'s Mem.Supp.Mot. Dismissal/Summ.J., App. F, Charge Sheet Ag. Woods, September 14, 1995 (Charges IV and VI).

creased his difficulty in assisting with Woods' defense. Def.'s Mem.Supp.Mot. Dismissal/Summ.J. at 4–6.

Wilson initially verbally ordered Woods to be restricted. On July 26, 1995, the day the charges were filed against Woods, Wilson issued a written order restricting Woods to the brigade area of the 24th Corps Support Groups and prohibiting him from going onto the grounds of Hunter Army Airfield. Woods was also told to request permission from Wilson or a First Sergeant of HHC should he desire to leave the confinement area. Colonel McGrady approved the terms of restriction after they were specifically set out by Captain Wilson. Enforcement was Captain Wilson's responsibility. Def.'s Mem.Supp. Mot. Dismissal/Summ.J., App. O, Wilson Dep. at 32; App. U, McGrady Dep. at 16.

At the time of Woods' attachment and restriction to Fort Stewart, Captain Wilson resided in Richmond Hill, a city located in a neighboring county. Wilson was on post for approximately 12–15 hours daily. The only person to whom Wilson communicated any information about Woods was First Sergeant John Ford. Wilson admits to having no knowledge of whether Ford lived on post or anywhere near Woods' barracks at the time. No other officers or soldiers with supervisory authority were informed of Woods' restricted status. Def.'s Mem.Supp.Mot. Dismissal/Summ.J., App. O, Wilson Dep. at 42–43; 52–53. While other officers in the unit lived on post, none lived in Woods' barracks or were informed of Woods' restriction including Staff Sergeant Shields.[3] The barracks NCO, a junior enlisted soldier, lived at the barracks but had no information on the nature of the charges against Woods or the specific terms of Woods' restriction. Pl.'s Resp. Def.'s Mot. Dismissal/Summ.J. at 2–3 (Doc. 22). The defendant states that Woods never violated the terms of his restrictive orders from July 4, 1995 to August 19, 1995. Plaintiff

disputes defendant's claim, stating that defendant has no factual basis to make this assertion because no system of checks was established to enforce the terms of the restriction. Plaintiff states that because Woods was not required to report his whereabouts to anyone on a periodic basis, and no one but Wilson and Ford knew of the restriction, no real restraints on his liberty existed for much of every day. Pl.'s Resp. Def.'s Mot. Dismissal/Summ.J. at 11.

**The Second Rape**

On August 19, 1995, the day after Woods submitted a pre-trial offer to plead guilty to the rape of Private X, Woods left Fort Stewart with a fellow soldier and traveled the 40 miles to Hunter and went to the Taro Leaf NCO Club. Def.'s Mem.Supp. Mot. Dismissal/Summ.J., App. J, "Stip. of Fact, *United States v. Woods* " at 6. Woods met and socialized with plaintiff at the club. Plaintiff rejected Woods' overtures for sex, and later tried to avoid him. When she exited the Club later that evening, Woods followed plaintiff to her car and got in the passenger seat while plaintiff was trying to leave. Plaintiff again refused Woods' requests for sex, and Woods began exposing himself. Def.'s Mem.Supp.Mot. Dismissal/Summ.J., App. J, "Stip. of Fact, *United States v. Woods* " at 6–7. After a brief conversation and struggle, Woods dragged plaintiff out of the vehicle and behind a nearby building and forcibly raped and sodomized her. During the attack, Woods violently struck plaintiff in the face with his fist in an attempt to keep her from screaming or attracting attention. Def.'s Mem.Supp. Mot. Dismissal/Summ.J., App. J, "Stip. of Fact, *United States v. Woods* " at 8–10. As a result of the violent and forcible rape and sodomy, plaintiff states she has suffered extreme depression and anxiety and that her psychological well-being has been permanently damaged. Pl.'s Compl. at 6.

---

**3.** The Court finds it interesting that Wilson neglected to inform Sergeant Shields (a woman and Woods' boss in the supply room) of Woods' record of sexual misconduct for

Shields' own safety. *See* Def.'s Mem.Supp. Mot. Dismissal/Summ.J., App. O, Wilson Dep. at 37, 53.

After complying with the administrative notice provisions of the FTCA, plaintiff timely filed a suit against the United States. In her complaint, plaintiff alleges that her injuries are the sole and proximate result of the United States Department of the Army and its officers' and agents' negligent failure to carry out the direct order of military officials to restrict Woods to the unit area of the 24th Corps Support Group and negligent failure to take specific and direct action to ensure that its orders of pre-trial confinement and/or restriction were being carried out appropriately. Pl.'s Compl. at 6. She also claims that the Army and its agents were negligent in failing to remove a known and dangerous person from the possibility of having any contact with either other military personnel or the general public. Pl.'s Compl. at 3. Defendant asserts the following affirmative defenses precluding liability: the discretionary function exception to the FTCA; the assault and battery exception, failure to state a claim on the merits under the express provisions of the FTCA as allowable under Georgia law, and the non-justiciability of internal military decisions. Def.'s Mem.Supp.Mot. Dismissal/Summ.J. at 3–4.

## Analysis

### I. Summary Judgment Standard

Summary judgment serves to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56 advisory committee's note, *cited in Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is appropriate only when the pleadings, depositions, and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A court must view the evidence and any inferences that may be drawn from the evidence in the light most favorable to the non-moving party. *See Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir.1985).

The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Such a showing shifts to the non-moving party the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1583 n. 16 (11th Cir.1991). "Factual disputes that are irrelevant or unnecessary will not be counted," *United States v. Gilbert*, 920 F.2d 878, 883 (11th Cir.1991) (citations omitted), and a mere scintilla of evidence supporting the non-moving party's position will not fulfill this burden. *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990).

### II. The Federal Tort Claims Act

Plaintiff asserts her claims under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), and 2671 et seq. (hereinafter "FTCA"). Under the doctrine of sovereign immunity, the United States is exempt from suit unless it consents to be sued. *Dalehite v. United States*, 346 U.S. 15, 30, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The jurisdiction of federal courts is limited by the terms of such consent. *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Subject to certain exceptions, "[t]he FTCA waives the United States government's sovereign immunity from suit in federal courts for the negligent actions of its employees." *Ochran v. United States*, 117 F.3d 495, 499 (11th Cir.1997). In order to effectuate this waiver, the United States employee must have been "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Autery v. United States*, 992 F.2d 1523, 1526 (11th Cir.1993) (citing 28 U.S.C. § 1346(b)). For

the following reasons, the FTCA bars the claims set forth in this case.[4]

### A. The Discretionary Function Exception

■ The United States' waiver of immunity under the FTCA is subject to certain exceptions. 28 U.S.C. § 2680. The discretionary function exception provides that the United States shall not be liable for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If this exception applies, "the FTCA claim must be dismissed for lack of subject matter jurisdiction." *Cohen v. United States*, 151 F.3d 1338, 1340 (11th Cir.1998).

■ In *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), "[t]he Supreme Court enunciated a two-part test for determining whether the discretionary function exception bars suit against the United States in a given case." *Cohen*, 151 F.3d at 1341. Initially, there must be a determination that the challenged conduct " 'involve[s] an element of judgment or choice.' " *Gaubert*, 499 U.S. at 322, 111 S.Ct. 1267 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). No element of judgment or choice is involved "if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.' " *Id.* (citation omitted).

If the first prong is satisfied, the court must then determine " 'whether that judgment is of the kind that the discretionary function exception was designed to shield.' " *Id.* (citation omitted). In *Gaubert*, the Court explained that "the purpose of the exception is to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *Id.* at 323, 111 S.Ct. 1267 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). The proper focus is "on the nature of the actions taken and on whether they are susceptible to policy analysis," *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267, and not on "the subjective intent of the government employee or ... whether the employee actually weighed social, economic, and political policy considerations before acting." *Ochran v. United States*, 117 F.3d 495, 500 (11th Cir.1997).

### 1. The Decision to Restrict, Rather than to Confine

■ With regard to the first prong, the plaintiff asserts that the decision to restrict, rather than to confine Woods did not involve an element of judgment or choice. Plaintiff argues that "[t]he 'Rules for Courts–Martial' (RCM), specifically RCM 305, set the standards to be applied when a decision was made between detention or restriction pending trial." Pl.'s Resp. Def.'s Mem. at 7–8. Thus, the plaintiff states, the decision made in this case was not discretionary because it involved the "day-to-day operational" implementation of these guidelines. Additionally, the plaintiff argues that the second prong is not satisfied because the decisions to restrict or confine "do not rise to the level of analyzing social, economic or political policy, nor do they involve questions of public policy." Pl.'s Resp. Def.'s Mem. at 8.

The plaintiff's argument regarding the decision to confine fails for two reasons. First, contrary to the plaintiff's argument,

---

4. Even if there was jurisdiction to review Captain Wilson's implementation of the restriction on Woods, the Court is not convinced that the plaintiff has established that Wilson's decisions were the proximate cause of the plaintiff's injuries. If Captain Wilson had informed Staff Sergeant Shields or the Barracks NCO, this tragic event may have occurred anyway. Woods may have escaped even if his superior officers had checked on him "on a periodic basis." Pl.'s Resp. Def.'s Mem. at 12.

the military commanders in this case were not subject to a mandatory regulation when deciding to confine or restrict. As the Eleventh Circuit explained in *Autery,* "[t]he relevant inquiry is whether controlling statutes, regulations and administrative policies mandated" the challenged conduct. *Autery,* 992 F.2d at 1528. Discretion can exist even if the officials must abide by a general rule. *Cohen,* 151 F.3d at 1342 ("[E]ven though a statute or regulation imposes a general duty on a government agency, the discretionary function exception may still apply if the agency retains sufficient discretion in fulfilling that duty."); *see also, Ochran,* 117 F.3d at 500 (same).

In *Ochran,* the plaintiff argued that the Attorney General Guidelines "imposed a mandatory course of action." *Ochran,* 117 F.3d at 500. The Eleventh Circuit rejected this argument, holding that "even though the Guidelines require the AUSA to arrange for the reasonable protection of a victim who is threatened, they did not specify how this protection is to be provided." The court further explained that "the use of the word 'shall' in describing the responsibilities of the AUSA does not necessarily mean that the Guidelines left no room for the AUSA to exercise judgment or choice." *Id.*

In the instant case, the military commanders relied on the guidelines set forth in RCM 305(d) when determining whether to restrict or confine Woods.[5] These guidelines set forth the factors to be considered when determining "when a person *may* be confined." RCM 305(d) (emphasis added). No mandatory directive existed that the commanders were compelled to follow. *Compare Phillips v. United*

*States,* 956 F.2d 1071, 1076 (11th Cir.1992) ("mandatory safety obligations").

The defendant has established that the commanders generally followed the 305(d) & (h) guidelines by consulting with the Staff Judge Advocate, Colonel Brooks and Captain Pixley, trial counsel at Hunter, before deciding not to confine Brooks. Further, the defendant has shown that the commanders weighed the potential threat to the public at large and the threat of flight against Woods' individual liberties before determining that restriction was a better option. Notably, there is also evidence that both McGrady and Passero had initially wanted to confine Woods and were persuaded by Captain Pixley and Colonel Brooks that there was not enough evidence to order Woods' confinement. *See* Def.'s Mem.Supp.Mot. Dismissal/Summ. J., App. A, Decl. Stephen P. Passero; App. B, Decl. Joel L. McGrady. Accordingly, the defendant has established that the decision not to confine Woods involved an element of judgment or choice by Woods' commanding officers.

▮▮▮ Since the defendant has satisfied the first prong of the *Gaubert* test, the Court must determine whether this type of decision is one that the discretionary function exception was designed to shield. In order to make this determination, the Court must find that the decision was "susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267. There is a presumption that "actions or decisions are 'grounded in [public] policy' in cases where the statute allows government officials to exercise discretion." *Cohen,* 151 F.3d at 1344 (quoting *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267). Like classifying prisoners,

---

**5.** RCM 305(d): When a person may be confined. No person may be ordered into pretrial confinement except for probable cause. Probable cause to order pretrial confinement exists when there is a reasonable belief that:
(1) An offense triable by court-martial has been committed;
(2) The person confine committed it; and
(3) Confinement is required by the circumstances.

In explaining RCM 305(d)(3), RCM 305(h)(2) states that "(iii) confinement is necessary because it is foreseeable that:
(a) The prisoner will not appear at trial, pretrial hearing, or investigation, or
(b) The prisoner will engage in serious criminal misconduct; and
(iv) Less severe forms of restraint are inadequate."

deciding how to restrain a soldier is "inherently policy laden." *Id.* Some of the policy issues weighed here included Woods' individual rights pending trial, protection of the general public, protection of other soldiers, and the scope of military investigation. These factors are exactly the type of policy judgments that the discretionary function is designed to shield.

■ The plaintiff's argument regarding the decision to confine also fails because plaintiff relies on a distinction between the planning level and operational level of decisions. The plaintiff argues that implementation of the guidelines set forth in RCM 305 was simply operational, and therefore, not a discretionary function. The Supreme Court, however, has rejected the operational/planning distinction. *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267 ("Discretionary conduct is not confined to the policy or planning level."). Several subsequent Eleventh Circuit cases reflect this holding. *Cohen*, 151 F.3d at 1342 ("[T]he mere fact a government official performs an action at the 'operational level' (as opposed to the 'planning level') does not remove that official's action from the discretionary function exception."); *Ochran*, 117 F.3d at 505–06 (same); *Autery*, 992 F.2d at 1527 (same). Accordingly, the operational/planning distinction has no impact on the determination of discretion under the *Gaubert* test. Under *Gaubert*, the Court finds that the decision to confine was discretionary.

### 2. Captain Wilson's Decisions Pertaining to the Implementation of Restriction

■ The plaintiff argues that even if the decision to confine Woods is barred from review under the discretionary function exception, Captain Wilson's methods of implementing Woods' restriction were not discretionary and are thus reviewable under the FTCA. The plaintiff relies on the operation/planning distinction in relation to Captain Wilson's methods of implementing Woods' restriction. Since this distinction is no longer followed in this Circuit, *supra*, Wilson's actions must be analyzed under the usual two-prong analysis of *Gaubert*.

■ The plaintiff argues that Wilson was given a mandatory order to restrict Woods and thus, his decisions were not discretionary. There is no evidence, however, that shows that Wilson was required to follow mandatory rules in determining whether Woods was to be restricted and what type of restriction would be implemented. Wilson was informed that Woods was being transferred to his unit, and Wilson was placed in charge of Woods' restriction. However, no commanding officer gave Wilson any mandatory directive regarding how to restrict Woods. Additionally, Wilson's decisions were grounded in the same public policy considerations as the initial decision to restrict. It must be stressed that the discretionary function exception applies even if there is an abuse of discretion. *Dickerson, Inc. v. United States*, 875 F.2d 1577, 1581 (11th Cir.1989). Thus, even though Captain Wilson's decisions and actions may have constituted a serious blunder (especially, as we have earlier stated, in hindsight), this Court is without jurisdiction to review those choices.

### B. Assault and Battery Exception

■ Even if the Court had found that this claim survived the discretionary function exception of the FTCA, the suit would still be barred under the FTCA's assault and battery exception. Under 28 U.S.C. § 2680(h), the FTCA does not apply to "[a]ny claim arising out of assault [and/or] battery," and, therefore, the federal district court has no jurisdiction over such a claim. In *United States v. Shearer*, 473 U.S. 52, 54, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985) the Supreme Court held that the "[r]espondent cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to prevent the assault and battery." The plaintiff in the instant case, however, relies on the Supreme Court's further analysis in *Sheridan v. United States*, 487 U.S. 392, 108

S.Ct. 2449, 101 L.Ed.2d 352 (1988). In *Sheridan,* the Supreme Court departed a bit from its holding in *Shearer,* explaining that the government could be liable for the assault and battery of its employees if the government owed an independent duty to the plaintiff. The Court explained that "by voluntarily adopting regulations that prohibit the possession of firearms on the naval base and that require all personnel to report the presence of any such firearm ... the Government assumed responsibility to 'perform [its] 'good Samaritan' task in a careful manner.' " *Id.* at 401, 108 S.Ct. 2449 (citations omitted).

 In the instant case, the plaintiff cannot argue that the Army owed her a duty arising out of specific military regulations since no such regulations exist in this case. Further, the plaintiff has also failed to establish a general duty to protect owed to her under Georgia law. Under the FTCA, the United States is only liable "in the same manner and to the same extent as a private individual under like circumstances ..." 28 U.S.C. § 2674. Since the claim in this case arose in Georgia, the Court must look to Georgia law to determine any duty owed to the plaintiff in this case. *Tisdale v. United States,* 62 F.3d 1367, 1371 (11th Cir.1995). Under Georgia law, neither private individuals nor the police have a duty to protect another individual, absent a special relationship. *City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861, 862 (1993); *Christensen v. State,* 219 Ga.App. 10, 464 S.E.2d 14, 18 (1995). The plaintiff has failed to establish the existence of a special relationship between herself and the United States Army that would give rise to a duty to protect. Because the plaintiff has not established that the Army had a duty to protect in this situation, her claim is not analogous to the facts of *Sheridan.* Thus, the assault and battery exception to the FTCA bars this suit.

**C.** *Quasi–Immunity Under Georgia Law*

 The plaintiff is also barred from suit under the doctrine of quasi-judicial immunity. Under the "like circumstances" rule set forth in the FTCA, the United States may claim any state law immunity that is enjoyed by state officials performing like duties. *Tisdale v. United States,* 62 F.3d 1367, 1371 (11th Cir.1995). The comparison between the circumstances of the United States officials and analogous state officials is "not overly stringent." *Burgess v. United States,* CV 495–108 at 7 (S.D.Ga. Order filed March 1, 1996) (citations omitted). Under Georgia law, public officials performing discretionary acts are entitled to "quasi-judicial" immunity. *Christensen,* 464 S.E.2d at 18. The court in *Christensen* defined discretionary acts as "those calling for the exercise of personal deliberation and judgment ..." *Id.* The court found that the parole board performed discretionary acts in deciding whether to grant parole to a convicted rapist. Like the parole board in *Christensen,* the military commanders in this case performed discretionary acts both in deciding whether to confine or restrict Woods and in deciding how to implement Woods' restriction. Thus, the actions of the military commanders are immune from suit under the quasi-judicial immunity theory.

**III.** *The Mindes Four Factors*

 If this Court were to deny summary judgment in the instant case, it would potentially be setting new standards for the Army. In *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971),[6] the Fifth Circuit warned against undue judicial interference with internal military matters. The court explained that "the greatest reluctance to accord judicial review has stemmed from the proper concern that such review might stultify the military in the performance of its vital mission." *Id.* at 199. Accordingly, "[a] district court faced with a sufficient

---

**6.** Fifth Circuit cases decided prior to October 1, 1981 are binding on the Eleventh Circuit

under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

allegation must examine the substance of that allegation in light of the policy reasons behind nonreview of military matters." *Id.* at 201.

One factor stressed by the court in *Mindes* was "[t]he type and degree of anticipated interference with the military function." Another factor important to the court was "[t]he extent to which the exercise of military expertise or discretion is involved." *Id.* If the Court were to deny summary judgment in the instant case, it would be telling the Army how to carry out confinement orders. This instruction would require military commanders to consider the possibility of future tort liability when attempting to make these decisions. Further, the decisions in this case were made by military commanders who, with the exception of Captain Wilson, all had over twenty years of military experience. Even though the Court has the deepest sympathy for the plaintiff for having to endure this heinous and terribly horrendous crime, the Court would be committing an error by reviewing these military decisions. Consequently, the *Mindes* factors also support the grant of summary judgment in this case.

### Conclusion

For the foregoing reasons,

**IT IS HEREBY ORDERED** that defendant's motion to dismiss is granted. Alternatively, the defendant's motion for summary judgment is granted.